## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

<table>
<tr><td>

**EDELSON V., L.P.,**

   **Plaintiff,**

**v.**

**ENCORE NETWORKS, INC., *et al.*,**

   **Defendants.**

</td><td>

Civ. No. 2:11-5802 (KM)


**OPINION**

</td></tr>
</table>

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Edelson V, L.P. ("Edelson"), a venture capital fund, brings this action against Encore Networks, Inc. ("Encore") and Peter C. Madsen, Encore's President and CEO. The Complaint alleges fraud, negligent misrepresentation, unjust enrichment, and a breach of fiduciary duty in connection with Edelson's equity investment in Encore.[1]

Encore's predecessor was a failed private communications technology company that went bankrupt and, according to Edelson, was reincarnated as Encore. Edelson alleges that Encore[2] failed to disclose this history, exaggerated the firm's sales and financial data, and stated that certain firms had contracted with Encore when, in fact, they had not. Encore then diverted business opportunities and assets into another entity where the defendants were shareholders but Edelson was not.

Encore has moved to dismiss the First Amended Complaint (the "FAC") for failure to state a claim, raising five main points. *See* Fed. R. Civ. P. 12(b)(6). First, Edelson ratified its investment after receiving the audited financial statements that form the basis of Edelson's claims. Second, Edelson's claims

---

[1] Edelson also sued Wesley Clover International Corporation a/k/a Wesley Clover Corporation and Terence H. Matthews. On October 11, 2012, the Court dismissed the claims against these defendants for lack of personal jurisdiction [ECF No. 42].

[2] Because Madsen and Encore are jointly represented, I refer to them collectively as "Encore," except when discussing the breach of fiduciary duty claim, which is alleged against Madsen only.

1

are barred by the statute of limitations. Third, the alleged misrepresentations and omissions are not actionable because they are statements of opinion and/or publicly disclosed. Fourth, Encore and Madsen claim that the FAC is not pled with the specificity required by Federal Rule of Procedure 9(b). Fifth, Edelson's breach of fiduciary duty claim against Madsen is derivative, and thus belongs to the corporation.

For the reasons expressed herein, I find that Edelson's complaint is sufficient and I deny Encore's motion to dismiss.

## I.    BACKGROUND

### A. Edelson Invests in Encore

The First Amended Complaint[3] ("FAC" [ECF No. 5]) alleges that Edelson is a venture capital fund that provides strategic and financial assistance to a wide variety of companies. (*Id.* ¶ 11). Encore, formed in 2002 as the successor entity to FastComm Communications Corp. ("FastComm"), is a telecommunications company that develops and sells integrated network security applications and converged signaling, voice, and data solutions for carriers and businesses in the United States, Latin America, and Asia. (*Id.* ¶ 14). Madsen served as the President, Chief Executive Officer, and Chairman of the Board, and as a Director of Encore. (*Id.* ¶ 28).

Around July or August 2003, representatives of the Bristol Investment Group, Inc., which Encore had hired to find investors, approached Edelson to see whether Edelson would be interested in funding Encore. (*Id.* ¶ 35). From the fall of 2003 into early 2004, Encore highlighted its business relationships with key customers and end users as the basis for claiming that it would be able to rapidly expand its product distribution in the global market. (*Id.* ¶ 5). To encourage Edelson to invest, Encore provided detailed financial, sales, and marketing information. (*Id.* ¶ 6).

As of February 5, 2004, Edelson purchased 4 million shares of Encore Class A Preferred Shares at $0.50 per share, for a total investment of $2 million. (*Id.* ¶ 4). As an additional inducement for the investment, Edelson and Encore entered into a Milestone Agreement on the same date. (Ex. G to Madsen Aff. [ECF No. 24-4]). The Milestone Agreement provided that, if Encore's

---

[3] The allegations of the Complaint have not yet been tested by any fact finder. This discussion, as it must, assumes their truth solely for the purpose of analyzing Defendant's Rule 12(b)(6) motion. *See* p. 8, *infra*.

audited revenue for the fiscal year ending April 30, 2005, did not equal or exceed $14.7 million, Edelson would have three-year warrants to purchase additional shares of Class A Preferred Shares at $0.01 per share. (*Id.*).

### B.  Edelson Discovers the Alleged Fraud

As time went by, Encore held fewer Board meetings and was increasingly reluctant to share financial information. (FAC ¶ 64). The little information Edelson did receive contained low sales figures. (*Id.*). Encore, however, assured Edelson not to worry because it had landed additional deals, with more on the horizon, that would make the promised revenue and returns materialize soon. (*Id.*).

In 2007, Edelson insisted on receiving audited financial statements for fiscal years 2005 and 2006. (*Id.* ¶ 65). Encore was to required issue these annually, but it did not do so until Edelson pressed the matter. (*Id.*). These financial statements revealed that numerous companies that Encore identified as customers as of fiscal year 2004 actually were never customers or did only minimal business with Encore. (*Id.* ¶ 67). In addition, the audit for the 2005 fiscal year showed revenues of $2.4 million, less than 10% of the revenue Encore claimed was certain for that year. (*Id.* ¶ 68). In addition, statements about Encore's customer base, sales orders, and revenue were inaccurate. (*Id.* ¶ 69).

### C.  Encore Diverts Business to an Alter Ego

In 2006, Encore and its beneficial owners, Wesley Clover International Corporation ("Wesley Clover") and Terence Matthews, formed Wesley Clover Solutions ("Solutions"), a private internet protocol solutions company. (*Id.* ¶ 72). Solutions' Canadian office is next door to Wesley Clover and its U.S. office has the same address as Encore. (*Id.* ¶ 73). Matthews is the beneficial owner of Solutions and has moved members of Encore's leadership team to Solutions. (*Id.* ¶ 74). Madsen, for instance, is President and Chief Executive Officer of Solutions, and his tenure there overlapped his tenure at Encore. (*Id.* ¶¶ 74, 76). Edelson believes that Solutions is developing products that parallel Encore's. (*Id.* ¶ 75). Encore would have sold these products absent the creation of Solutions. (*Id.*). Neither Madsen nor anyone else informed Edelson about Solutions or disclosed that Encore's management was operating Solutions out of Encore's premises. (*Id.* ¶ 77).

3

### D. Edelson Exercises Its Warrants

The fiscal year 2005 audit, completed and provided to Edelson in 2007, disclosed that Encore had failed to meet the revenue projections contained in the Milestone Agreement. (*Id.* ¶ 78). Accordingly, the Milestone Agreement entitled Edelson to purchase more than four million additional shares of Class A Preferred Shares at $0.01 per share. (Ex. G to Madsen Aff.; Def. Br. at 9 [ECF No. 15-7]). Around April 30, 2010, Edelson exercised the warrants, purchasing 4,335,036 Class A Preferred Shares. (Stock Purchase Warrant Certificate, Ex. N to Madsen Aff. [ECF No. 15-6]). As a result, Edelson ended up holding approximately 40% of Encore's Class A Preferred Shares. (FAC ¶ 78).

### E. Edelson Files the Present Action

On October 11, 2011, Edelson filed the Complaint in this action, followed by the FAC on November 4, 2011. Edelson is a Delaware limited partnership with its principal place of business in New Jersey. (*Id.* ¶ 10). Its individual members are citizens of New Jersey, New York, and the United Kingdom. (*Id.*). Its business entity members are incorporated in New York, the Jersey Islands, and the United Kingdom, with principal places of business, respectively, in New York, Switzerland, and the United Kingdom. (*Id.*). Encore, a telecommunications company, is a Virginia corporation with its principal place of business in Virginia. (*Id.* ¶ 13). Madsen, an officer of Encore at all relevant times, is a citizen of Virginia. (*Id.* ¶¶ 27-28). Because the amount in controversy exceeds $75,000 and diversity of citizenship exists between Edelson and Encore/Madsen, this Court has diversity jurisdiction. 28 U.S.C. § 1332(a). Venue appears to be proper because Encore transacted business in New Jersey and a substantial part of the events or omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(b).

The FAC includes causes of action for fraud, negligent misrepresentation, unjust enrichment, and a breach of fiduciary duty. Edelson's fraud-based claims arise from what it claims are material omissions and misrepresentations of fact. Put simply, Encore (1) concealed that it was the reincarnation of a defunct company with the same staff and products; (2) falsely asserted that it had a substantial, existing customer base and lucrative contracts, and (3) made disingenuous and unreasonable short-term forecasts about current and anticipated revenue. (*Id.* ¶ 6).

### 1. Material Omissions Regarding Encore's Predecessor Company

At no point did Encore explain Encore's history, how and why it was formed, and Madsen's involvement with Encore's predecessor, FastComm. (*Id.* ¶ 37). These omissions were material because FastComm's bankruptcy and its similarity to Encore would have raised red flags and dissuaded Edelson from investing. (*Id.* ¶ 38).

Beginning around 1992 or 1993, Madsen and another Encore officer, Mark H. Rafferty, served as the senior management team for FastComm. (*Id.* ¶ 38(c), (e), (f)). The products that FastComm offered were later sold by Encore. (*Id.* ¶ 38(g)).

From 1993 to 1998, FastComm suffered substantial business losses, and on June 2, 1998, it filed a voluntary Chapter 11 bankruptcy petition. (*Id.* ¶ 38(i)). Significant losses continued: for the fiscal year ending April 30, 1999, FastComm reported a loss of about $9 million; for the fiscal year ending April 30, 2000, $5.5 million; and for the fiscal year ending April 30, 2001, almost $13 million. (*Id.*). FastComm's sales of its signaling product line declined from $6.7 million in the nine months ending January 27, 2001, to $2.1 million in the nine months ending January 26, 2002. (*Id.*).

Around May 5, 2002, FastComm again filed for Chapter 11 bankruptcy. (*Id.* ¶ 38(m)). By the summer of 2002, however, Wesley Clover, its sole secured creditor, seized all of FastComm's assets. (*Id.*). FastComm's Chapter 11 bankruptcy proceeding was converted to a Chapter 7. (*Id.*). FastComm's assets, including its customers, products, technology, and management, were rolled into Encore. (*Id.* ¶ 38(n)).

Edelson alleges that a prudent investor would not have invested in Encore if informed that Encore was the reincarnation of FastComm, a company that had failed miserably. (*Id.* ¶ 41).

### 2. Material Misrepresentations and Omissions Regarding Encore's Customers

Encore represented to Edelson that Encore's existing customer base was substantial and comprised a "large network" of well-known vendors, service providers, system integrators, and end users. (*Id.* ¶ 54). Further, Encore was expecting significant revenues from these customers (*id.* ¶ 48), whose orders were "pouring in." (*Id.* ¶ 55). In addition, Encore customers were supposedly

already purchasing Encore's products, and some customers were reselling Encore's products in the marketplace. (*Id.* ¶ 48). Encore also made representations that a number of well-known companies were already customers of Encore and that they had generated revenue for Encore, and would continue to do so. (*Id.* ¶ 49 (listing companies)). Edelson alleges that, at the time these representations were made, none of the listed customers were existing customers that had actually purchased products, none had generated revenue, and there was no factual basis for the statement that any of these companies would become a continuing customer. (*Id.* ¶ 50). At best, some of these "customers" may have been FastComm customers/unsecured (and unpaid) creditors. (*Id.*).

Encore also represented to Edelson that Encore had signed a contract with Amadeus North America, Inc. ("Amadeus") for 4,000 units of Encore's Virtual Private Network ("VPN") secure router and that Encore had commenced delivery. (*Id.* ¶ 51). Encore said that sales under this agreement would produce revenue of about $4 million over the next 18 months and that Amadeus's Senior Vice President was on Encore's Board of Directors, cementing the relationship and ensuring future sales. (*Id.*). Edelson alleges that there was no basis to project a large number of sales to Amadeus or $4 million in revenue and that, in fact, actual sales were inconsequential. (*Id.* ¶ 52).

Another significant misrepresentation, according to Edelson, was that Sprint had certified Encore's products, placed them in its catalog of customer premise equipment, and had selected Encore for use in its long distance division. (*Id.* ¶ 53). Encore intimated that it had an existing contractual relationship with Sprint that would yield about $2 million annually. (*Id.*). In addition, as with Amadeus, Encore advised Edelson that Sprint's former Chief Technology Officer was on Encore's Board of Directors. (*Id.*). In actuality, Sprint had ordered a very limited amount of Encore equipment in early 2003 and total sales for that year were $34,000. (*Id.*).

### 3. Unreasonable Revenue Forecasts

Encore represented to Edelson that it had and would generate approximately $8.6 million for the 2004 fiscal year and $20.7 million for the 2005 fiscal year. (*Id.* ¶ 56). Near term revenue would be about $26 million. (*Id.*). Madsen made oral representations that were even more bullish based on orders that were "pouring in." (*Id.*). Edelson claims that these forecasts, however, were made with no basis in fact because they were based on the misrepresentations stated above about the existence, identity, and sales volume of companies that

were either minimal purchasers or not actual customers of Encore. (*Id.*). Further, Encore's small sales were declining, not increasing. (*Id.* ¶ 57). Its actual revenue for the 2004 fiscal year was $3.2 million, and for the 2005 fiscal year, $2.4 million. (*Id.* ¶ 58).

According to Edelson, these representations and omissions induced it to invest $2 million in Encore, giving rise to the claims in the FAC.

## II.   LEGAL STANDARDS AND BACKGROUND

### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party, ordinarily the defendant, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). For purposes of a motion to dismiss, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by subsequent Supreme Court case law).

In recent years, the United States Supreme Court has elaborated on the standards that a court is to apply in analyzing a Rule 12(b)(6) motion to dismiss, particularly in light of the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, demonstrating that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S.*

*Immigration & Customs Enforcement*, 643 F.3d 60, 70-73 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209-211 (3d Cir. 2009). The Court of Appeals recently summarized the three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See* [*Iqbal*, 556 U.S.] at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

Encore asserts that certain of the allegations of the Complaint sound in fraud and therefore must be pleaded with additional particularity. *See* Sections III.C and D, *infra*. Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement for allegations of fraud, over and above that required by Rule 8(a). *Hughes v. Panasonic Consumer Elecs. Co.*, No. 10–846, 2011 U.S. Dist. LEXIS 79504, at *29, 2011 WL 2976839 (D.N.J. July 21, 2011). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." *Id.* That heightened pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal quotation and citation omitted).

In general, "[t]o satisfy this heightened standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* "Plaintiff must also allege who made the misrepresentation to whom and the

general content of the misrepresentation." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (internal citation omitted); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006) ("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.") (internal quotation and citation omitted)). The plaintiff

> need not, however, plead the "date, place or time" of the fraud, so long as they use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent false or unsubstantiated charges. Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.

*Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (quoting *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984) and citing *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983)).

In addition, the Third Circuit has stated that these pleading requirements may be applied less strictly in the context of corporate fraud:

> Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." *Christidis[ v. First Pa. Mortg. Trust]*, 717 F.2d [96,] 99-100 [3d Cir. 1983]. Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987); C. Wright & A. Miller, § 1298 at 416. Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control.

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989); *DiMare v. MetLife Ins. Co.*, 369 Fed. App'x 324, 330 (3d Cir. 2010) (non-precedential).

## III.   DISCUSSION

Encore has moved to dismiss Edelson's claims of common law fraud, equitable fraud, negligent misrepresentation, and unjust enrichment (as to Encore and Madsen), and breach of fiduciary duty (as to Madsen only). As to the fraud-based claims, Encore makes four main arguments. First, when Encore exercised its warrants in 2010, about three years after learning the facts underlying its claim, Edelson ratified Encore's conduct. Second, Edelson was aware of these facts in 2004, but did not file this suit until 2011 – after the six-year statute of limitations period ended. Third, the FAC's alleged misrepresentations and omissions are either not actionable or were disclosed. Fourth, the FAC does not meet the pleading with particularity requirement of Federal Rule of Civil Procedure 9(b). As to the breach of fiduciary duty claim, Encore argues that it is a derivative claim that requires a pre-suit demand on the board, which Edelson did not do.

### A. Ratification

Encore argues that Edelson ratified Encore's conduct by exercising its warrants in 2010, three years after receiving the 2005 and 2006 fiscal year audited financial statements that laid bare Encore's poor performance. In light of this, claims Encore, Edelson cannot pursue its fraud claims.[4] Edelson responds that the exercise of its warrants was not a ratification of the alleged fraud, but an effort at mitigation of damages.

In fraud cases, a plaintiff has a duty to mitigate damages after learning about the fraud. *Lack Indus., Inc. v. Ralston Purina Co.*, 327 F.2d 266, 281 (8th Cir. 1964); *Rocker Mgmt., LLC v. Lernout & Hauspie Speech Products N.V.*, Civ. No. 00-5965, 2007 WL 2814653 (D.N.J. Sept. 24, 2007) ("Lastly, as in any case based on fraud, once a holder of a short position obtains knowledge of fraudulent activity or a material misrepresentation, he has a duty to mitigate."); *see Ostrowski v. Azzara*, 111 N.J. 429, 441, 545 A.2d 148 (1988) ("[w]here the defendant has already committed an *actionable wrong*, whether *tort* or breach of contract, then th[e] doctrine [of avoidable consequences, or mitigation of damages] limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted"); *Kanellos v. Williams Termite Co.*, No. A-2428-04T3, 2007 WL 283437, at *8 (N.J. Super. Ct. App. Div. Feb. 2, 2007) (finding correct the judge's jury instruction on mitigation:

---

[4] While Encore does not specify what it means by Edelson's "fraud claims," I take that to mean all of the causes of action in the FAC except for breach of fiduciary duty.

"that parties who suffer injury or damage because of fraud [must] make a reasonable effort to avoid or minimize the loss by taking advantage of such reasonable opportunities that they have under the circumstances.").

After Encore's performance fell short of the projections in the Milestone Agreement, Edelson had the opportunity to purchase an additional four million shares in Encore at a fraction of what it paid to initially invest: $0.01 per share versus $0.50. This gave it ownership of about 40% of Encore's preferred stock for about 2% of the original cost. In doing so, Edelson put itself in line to receive a larger share of any recovery from asset sales or bankruptcy. The allegations are amply consistent with Edelson's not having ratified the fraud, but merely mitigated its damages, as the law requires.[5]

## B. Statute of Limitations

Encore argues that Edelson's claims are time-barred. Specifically, Encore states that Edelson became aware of the facts underlying its claims in 2004 through documents provided to Edelson's principal in his role as a director of Encore. Because New Jersey has a six-year statute of limitations for fraud actions, N.J. Stat. Ann. § 2A:14-1,[6] and the original complaint was filed in 2011, Encore believes that Edelson's claims are time-barred.

---

[5] Even assuming *arguendo* that Edelson's actions did constitute ratification, dismissal would not be warranted. Ratification serves chiefly to bar the remedy of rescission; a claim for damages, even if reduced, would remain. *See Daibo v. Kirsch*, 316 N.J. Super. 580, 591, 720 A.2d 994, 1000 (App. Div. 1998) ("A defrauded party who affirms the contract may recover the difference between the value of what he received and the value of what he gave") (internal quotation and citation omitted).

[6] "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most significant relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011) *aff'd sub nom. Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the law alleged and any other potentially applicable law. *P.V. v. Camp Jaycee*, 197 N.J. 132, 962 A.2d 453, 460 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). A conflict exists here: for fraud actions, the limitations period in New Jersey is six years, N.J. Stat. Ann. § 2A:14-1, and in Virginia it is two years, Va. Code Ann. § 8.01-243.

Edelson responds that the statute of limitations bar is not apparent from the face of the complaint, which is the standard for a 12(b)(6) motion on limitations grounds. I agree. From the FAC and the documents it incorporates[7] it is not readily apparent that Edelson's claims were filed outside of the limitations period. Generally,

> a limitations defense must be raised in the answer, since Rule 12(b) does not permit it to be raised by motion. However, the law of this Circuit (the so-called "Third Circuit Rule") permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).

*Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (internal quotations and citations omitted).

---

If a conflict exists, the court then moves to the second prong: "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws; for fraud actions, this is § 148. *Maniscalco*, 793 F. Supp. 2d at 704 (quoting *Camp Jaycee*, 197 N.J. at 136, 962 A.2d 453); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 463-64 (D.N.J. 2009). Though it applies the wrong choice of law test, Encore believes that New Jersey law applies, (Encore Br. at 15 n.9 [ECF No. 24-7]), and Edelson does not disagree. The lack of a factual record makes this analysis challenging. However, based on a review of the FAC and the factors in Restatement (Second) of Conflict of Laws § 148(2), I am satisfied that New Jersey has the most significant relationship to the claim at issue because of the direct targeting of Edelson in New Jersey. *See Agostino*, 256 F.R.D. at 462-63, 464.

[7] "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). As it relates to Encore's motion, the documents I may consider are the FAC and the original complaint, the Confidential Information Memorandum, the Stock Purchase Agreement, the Milestone Agreement, Encore's audited financial statements for fiscal years 2005 and 2006, the Warrant Certificate, and FastComm's SEC filings. The other documents Encore submitted are not "undisputedly authentic documents" that are central to Edelson's claims. *Id.*

A statute of limitations defense in a fraud case depends on when a plaintiff discovered or should have discovered the facts underlying the fraud. As one might suspect, that is a fact-intensive inquiry generally not suited for resolution at the motion to dismiss stage. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 602 (D.N.J. 2001) ("While inquiry notice may in some cases be determined as a matter of law, . . . it is inappropriate to dismiss claims as time-barred where, as here, the analysis is so fact-intensive.") (citing *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, Civ. No. 98-4318, 2000 WL 10211, at *3 (S.D.N.Y. Jan.6, 2000) ("the issue of constructive knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage of this litigation")); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997) (question of inquiry notice is "illsuited for determination on motion to dismiss");

As long as the operative complaint alleges facts to toll the statute of limitations, a motion to dismiss based on the statute of limitations should be denied. *See In re Elec. Carbon Products Antitrust Litig.*, 333 F. Supp. 2d 303, 317 (D.N.J. 2004) (rejecting defendants' motion to dismiss fraudulent concealment count, stating "[t]he question of whether the plaintiffs exercised due diligence to uncover their claim implicates factual questions as to when plaintiff discovered or should have discovered the elements of the cause of action. On a motion to dismiss, therefore, the issue is whether plaintiffs have alleged facts which, if accepted as true, establish that they exercised due diligence." (internal citation and quotation omitted)).

The FAC clearly, and plausibly, alleges that Edelson became aware of the fraud in 2007 when it received audited financial statements for the 2005 and 2006 fiscal years. (FAC ¶ 65). Encore urges the contrary inference that the 2004 financial statements distributed to Edelson at an April 27, 2004 board meeting put Edelson on notice of the facts underlying its fraud claims.[8] Those

---

[8] The allegation in the original complaint, ¶ 30 [ECF No. 1] reads:

For instance, following Edelson's investment, revenue estimates were reduced but Encore's Representatives repeatedly promised that additional revenue was only delayed and would still materialize. In a board meeting during the Spring of 2004, immediately following Edelson's investment, financial projections were given that were lower than prior figures, but Edelson was told through a letter from Mark Rafferty to the Encore Board of Directors transmitted with the Company's financial plan for 2005 that a "sharp increase" in revenue was expected for FY 2005. This letter represented numbers for FY 2005 that were in line with those provided before Edelson's investment.

13

financial statements indicated that (1) revenue for fiscal year 2004 was forecast to be $3.5 million, compared to $9.7 million in the Confidential Information Memorandum; (2) actual revenue for the first three quarters of fiscal year 2004 was $2.5 million; and (3) the revenue projected for fiscal year 2005 was lowered from $20.7 million to $15.1 million. The 2004 financial documents, however, were unaudited and, in any case, were accompanied by reassurances from Encore's Vice President, Chief Financial Officer, and Secretary, Mark Rafferty, that revenue would sharply increase in fiscal year 2005, resulting in earnings over $20 million in the months ahead. (FAC ¶ 65).

Encore has raised, at best, an issue of fact. That of course does not warrant dismissal. It is not apparent from the face of the FAC that Edelson's fraud claims are barred by the statute of limitations. Accordingly, Encore's motion to dismiss on those grounds is denied.

## C. Edelson's Specific Alleged Misrepresentations and Omissions

The elements for a fraud claim in New Jersey are: "'(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 28, 50 A.3d 75, 85 (App. Div. 2012) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997)). A plaintiff must plead allegations of fraud with particularity. *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004). Encore makes a number of arguments specific to those elements. First, the financial projections that form the basis of Edelson's claims are non-actionable statements of opinion or predictions of future performance. Second, Encore listed sales opportunities, not current customers, and opportunities are not actionable. Third, Encore disclosed that it was the successor entity to FastComm and information on FastComm was publicly available, so Edelson's lack of due diligence, not Encore's perfidy, is to blame for its losses.

### 1. Financial Projections

Encore argues that four of the alleged misrepresentations are not misrepresentations of existing fact, but forward-looking statements that cannot form the basis of a fraud claim:

i.   "Encore had generated and would generate $8.6 million in revenue for the 2004 fiscal year (ending April 30, 2004) and would generate

$20.7 million for the 2005 fiscal year beginning in May 2004." (FAC ¶ 56).

ii. "Encore would generate some '$26 million in near term revenue.'" (*Id.*).

iii. A "'sharp increase' in revenue would occur in the 2005 fiscal year," and "Encore would earn more than $20 million in revenue in the months ahead from the orders pouring in." (*Id.* ¶ 63).

iv. Edelson did not need to worry about Encore's sales figures because "there were additional deals that had already been landed, as well as other deals on the horizon which would make the promised revenue and returns materialize soon." (*Id.* ¶ 64).

"Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Alexander v. CIGNA Corp.,* 991 F. Supp. 427, 435 (D.N.J. 1998). However, "[a]n opinion or projection, like any other representation, will be untrue if it has no valid basis." *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir. 1985); *Kline v. First Western Gov't Servs., Inc.,* 24 F.3d 480, 486 (3d Cir. 1994).

The FAC alleges that such projections had no valid basis in fact and that Encore knew this. (*See* FAC ¶¶ 57, 58, 63, 66, 69). Accordingly, these alleged misrepresentations are actionable.[9]

2. Customer Base

Encore argues that the Confidential Information Memorandum (the "CIM") clearly stated that Encore was relying on "the FastComm customer base," and that the cited companies represented "sales opportunities," not existing customers. (CIM at 8, Ex. E to Madsen Aff [ECF No. 24-3]).

---

[9] Rule 9(b) states that state of mind may be alleged generally, not with the particularity required of other elements of fraud. Edelson's allegations satisfy this burden.

In addition, Edelson's allegations are more specific, and the alleged misrepresentations lack the cautionary language contained in the statements found not actionable in *In re Nokia Oyj (Nokia Corp.) Sec. Litig.,* 423 F. Supp. 2d 364, 400 (S.D.N.Y. 2006) (holding that the alleged misrepresentations were "hopeful statements, tinged with caution, that cannot reasonably be found to be misleading and therefore relied upon to allege violations of the securities laws.").

At the motion to dismiss stage, an investor may rely on a company's representations of sales opportunities or imminent contracts as the basis for a fraud claim. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 877 (3d Cir. 2000) (finding that statements that can reasonably be construed as a representation of the current state of negotiations can constitute misrepresentations of a present fact). In addition, where representations are made regarding significant sales opportunities and imminent customer contracts, these can be part of a package of fraudulent misrepresentations. *See id.* at 879 ("the sales projections and financial model were tied into the representation that these contracts were imminent. . . . Therefore, we are not prepared to hold that the sales projections are completely immaterial at this pleading stage of the proceeding, as they may reinforce the materiality of the imminent contracts representation.")

The FAC, at any rate, does not merely allege that Encore said customer contracts were imminent; rather, Encore represented that a number of companies were "existing and continuing customers of Encore, that they had generated revenue for Encore, and that they would continue generating revenue for Encore" when none of those things were true. (FAC ¶¶ 49-50 (listing companies)). (A number of the listed companies, moreover, are not among the "sales opportunities" referred to in the CIM.)

The CIM itself goes beyond merely listing "sales opportunities." The same section of that memo goes on to state as a present fact that:

- "Amadeus *has entered into a contract* for up to 4,000 Bandits pro*ducing revenue of approximately $4 million over the next 18 months.*" (CIM at 8 (emphasis added));

- "Encore's VPN and frame relay devices . . . are part of Sprint's customer premise equipment (CPE) catalog. Encore *recently won* a SP230 application with Sprint LDD for *approximately $2 million.*" (*Id.* (emphasis added));

- "The Company's R2 Adapter is *being resold* by Alcatel, Nortel, Siemens, and 3Com . . . ." (*Id.* at 7 (emphasis added)).

The FAC alleges that these statements of presently existing fact were false or misleading. (*See* FAC ¶¶ 48-55).

16

Encore also argues that Edelson, as a sophisticated investor, cannot have reasonably relied on the projections because the projections were based on a $3 million capital infusion. No such assumption is mentioned in the CIM. (*See* CIM at 24 (noting assumptions)).[10]

In short, the FAC's allegations about Encore's existing or prospective customer base are sufficient to withstand a motion to dismiss.

### 3. Omission of FastComm's History and Due Diligence

The CIM states that FastComm was Encore's predecessor company. (CIM at 4 ("Encore leverages the assets, technology and installed customer base of its predecessor, FastComm Communications Corp. Wesley Clover Corporation has funded the Company's refocused business strategy.") and 6 ("Encore's predecessor (FastComm) deployed thousands of frame relay access devices FRAD's in the travel industry . . . .")).

Encore argues that these mentions, combined with FastComm's publicly-available SEC filings, disclosed to Edelson (or any other potential investor) its corporate history. Specifically, this information showed that FastComm was a similar company that ended up filing for bankruptcy. Due diligence, says Encore, would have revealed further details of the FastComm debacle. Consequently, Encore reasons, a sophisticated investor like Edelson cannot allege reasonable reliance.[11] Edelson states that Encore omitted a material fact:

---

[10] The general cautionary language contained in the CIM does not prevent Edelson from bringing its fraud claims. *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) ("A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.")

Nor, at the motion to dismiss stage, can I bar Edelson's claims based on an alleged failure to perform its own reasonable investigation of the prospective customers. *See generally EP Medsystems*, 235 F.3d at 883 ("MedSystems [did not] have access to information that would have suggested that the imminent contracts representation was false. Whether MedSystems, after being told by EchoCath's CEO for the second time that contracts with four companies were imminent, should have approached one or more of the four companies and asked for a verification of the present state of negotiations is an issue for the trier of fact, not for a judge ruling on the sufficiency of the pleadings. We cannot say that MedSystems' reliance on the imminent contracts representation was unreasonable as a matter of law.")

[11] The approach to "reasonable reliance" under New Jersey law is similar to that

FastComm was a failed enterprise and Encore, as virtually the same company, was destined to share the same fate.

The FAC can be fairly read to allege that the CIM was less than forthcoming about the extent of Encore's roots in FastComm. The brief biographies of Madsen and Rafferty omit their work history at FastComm. (CIM at 18). Basing Encore's growth prospects on FastComm's customer base is an incomplete representation, as the FAC alleges that FastComm's customer base shrank considerably over time. (FAC ¶ 38(k)). The CIM gave no hint that FastComm had a troubled past, and misleadingly suggested that FastComm, if anything, was part of the foundation of Encore's rosy future. That may not be overwhelming, but it is sufficient at the pleading stage.

Additionally, in performing due diligence, Edelson is required only to have acted reasonably; reasonableness is a factual issue, to be determined on a case-by-case basis, and cannot easily serve as the foundation of a motion to dismiss. The Third Circuit, moreover, has stated that "a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commerce and makes it possible for an almost limitless number of transactions to take place without resort to the courts." *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 598 (3d Cir. 1976). *Id.* "Since the failure to meet that standard is in the nature of an affirmative defense, the burden of proof rests upon the defendant. Such matters as fiduciary relationship, opportunity to detect the fraud, sophistication of the plaintiff, the existence of long standing business or personal relationships, and access to the relevant information are all worthy of consideration." *Id.* In other words, whether Edelson's due diligence was appropriate is fact-dependent and ill suited to resolution by motion. Accordingly, Encore's motion to dismiss on these grounds is denied.[12]

---

under federal securities laws. *See Braunstein v. Benjamin Berman, Inc.*, Civ. No. 89–5344, 1990 WL 192547 (D.N.J. Sept. 12, 1990).

[12] As Edelson points out, the cases that Encore cites are distinguishable on their facts. *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) (finding no justifiable reliance where the defendants' fee was disclosed solely in later letters, but all communications included instructions for acquiring additional information; only a "superficial or careless reading of these documents" would lead an investor to misunderstand the fee. Here, by contrast, a reading of the CIM shines no light on the alleged omission – FastComm's descent into liquidation.); *Harsco Corp. v. Bowden*, Civ. No. 94-6191, 1995 WL 152523, at *7 (S.D.N.Y. Apr. 5, 1995) *aff'd sub nom. Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir.

### D. Edelson's Fraud Claims and Rule 9(b)

Rule 9(b) requires that a plaintiff plead allegations of fraud with particularity, although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In general, this means that the plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal quotation and citation omitted). I therefore review the fraud-based allegations again with a particular eye to Rule 9(b), the standards of which are discussed at pp. 8-9, *supra*.

Edelson charges that the FAC falls short of Rule 9(b) requirements because it does not (1) specify which defendant made the alleged misrepresentation and (2) identify each allegedly fraudulent misrepresentation. I have reviewed the FAC and find that it satisfies Rule 9(b). Its allegations are sufficiently detailed to put Encore "on notice of the precise misconduct with which it is charged." *Frederico*, 507 F.3d at 200. The allegations include when the misrepresentations were made, (FAC ¶¶ 1, 5-7, 8, 35, 36, 38, 46, 48, 51, 58, 60, 62, 63, 65, 72), who made the representations or omitted information, and the recipient, (FAC ¶¶ 30, 35-37, 43-44, 46-49, 51, 53-56, 62-64, 72, 77, 79), and the content of the alleged misrepresentations and omissions, (FAC ¶¶ 1, 5-7, 37-39, 41, 43-44, 48-56, 58, 62-64, 66-69, 72, 74-77, 79-81). The motion to dismiss on Rule 9(b) grounds is denied.

### E. Breach of Fiduciary Duty

Madsen argues that the FAC's Sixth Count, breach of fiduciary duty (minority shareholder oppression), should be dismissed for two reasons. First, an officer's alleged breach of his fiduciary duties is a derivative claim that must be brought on behalf of the corporation in the first instance. Second, a shareholder who wishes to bring such a claim must allege that it demanded in writing that the corporation's board of directors pursue the claim against the officer and that the board refused. Here, Edelson did not do so. Edelson

---

1996) (holding plaintiff, a sophisticated investor, did not show reasonable reliance because it "chose to close the deal, in spite of denials of access during both exploratory and confirmatory due diligence;" the denial of access put the plaintiff on "inquiry notice of a problem"); *Greenberg v. Pro Shares Trust*, No. A-0759-10T3, 2011 WL 2636990 (N.J. Super. Ct. App. Div. July 7, 2011) (finding no reasonable reliance where plaintiff had received the prospectus, which contained warnings and disclaimers contradicting oral representations the defendants made to the plaintiff).

responds that a minority shareholder can bring a suit directly against a majority shareholder for breach of a fiduciary duty, especially where the minority shareholder has suffered direct harm.

I must first determine whether New Jersey or Virginia law applies. In a diversity case, the district court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under New Jersey law, the court must first determine whether a conflict actually exists between New Jersey law and any other potentially applicable law. *P.V. v. Camp Jaycee*, 197 N.J. 132, 962 A.2d 453, 460 (2008). As there is no conflict between the New Jersey and Virginia law relevant to this claim, I will apply New Jersey law.[13]

While "[b]reach of a fiduciary obligation is a tort claim, and thus requires the showing of a duty, a breach, an injury, and causation," Madsen does not challenge any of these elements. *In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1457 (D.N.J. 1987). Rather, he argues only that this type of suit is a derivative one that Edelson may not bring unless it made a pre-suit demand on the Board (unless the demand would have been futile).

Edelson need not pursue this as a derivative claim if it suffered harm as an individual. *In re Kaplan*, 143 F.3d 807, 812 (3d Cir. 1998); *Davis v. U.S. Gypsum Co.*, 451 F.2d 659, 662 (3d Cir. 1971). The FAC alleges that Edelson did: Madsen diverted assets and corporate opportunities from Encore to Wesley Clover Solutions, a company in which Edelson had no interest. Matthews, the majority beneficial shareholder of Encore, was also the beneficial owner of

---

[13] Both states require a shareholder to make a pre-suit demand on the board of directors in the case of a derivative cause of action. N.J. Court R. 4:32-3; Va. Code Ann. § 13.1-672.1. In addition, both permit a shareholder to maintain a cause of action for breach of fiduciary duty where the shareholder suffers an individual injury. *In re Kaplan*, 143 F.3d 807, 812 (3d Cir. 1998); *Davis v. U.S. Gypsum Co.*, 451 F.2d 659, 662 (3d Cir. 1971) ("It is hornbook law that claims asserted for the benefit of stockholders qua stockholders in a corporation because of the tortious acts of its officers or those actions in conjunction with them is a class suit, a derivative action, and recovery is for the benefit of the corporation directly and indirectly to its stockholders. It is equally clear that where a corporation, tortiously conspires with others to damage an individual and does so a cause of action arises which belongs to the individual."); *Schupp v. Jump! Info. Technologies, Inc.*, 65 F. App'x 450, 454 (4th Cir. 2003) (non-precedential) ("Virginia law may permit an individual shareholder to bring an action for breach of fiduciary duty *against the directors or officers* of a closely held corporation" (citing *Byelick v. Vivadelli*, 79 F. Supp. 2d 610, 625 (E.D. Va. 1999) (emphasis in original)).

Solutions, and Madsen was an officer of both. The real victim of the alleged diversion, then, would have been Edelson, which may bring the breach of fiduciary claim directly. Accordingly, Madsen's motion to dismiss this claim is denied.

## IV.   CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss is **DENIED**.

An appropriate order follows.

KEVIN MCNULTY, U.S.D.J.

Date: May 9, 2013